**ADVANCED DISPLAY SYSTEMS, INC., Plaintiff–Appellee,**

and

**Bao Gang Wu, Third Party Defendant–Appellee.**

v.

**KENT STATE UNIVERSITY and Kent Research Corporation, Defendants/Third–Party Plaintiffs–Appellants,**

and

**Kent Display Systems, Inc., Defendant/Third–Party Plaintiff–Appellant.**

**Nos. 99–1012, 99–1013.**

United States Court of Appeals, Federal Circuit.

May 18, 2000

Kevin C. Nash, of Dallas, Texas, argued for plaintiff-appellee and third party defendant-appellee. With him on the brief was C. Michael Clark, Attorney at Law, of Corinth Texas.

Richard J. Hoskins, Schiff Hardin & Waite, of Chicago, Illinois, argued for defendants/third party plaintiffs-appellants. With him on the brief were Patricia J. Thompson and Julie L. Brown. Of counsel on the brief was Ray L. Weber, Renner, Kenner, Grieve, Bobak, Taylor & Weber, of Akron, Ohio. Of counsel were V. James Adduci, II, and Michael L. Doane, Adduci, Mastriani & Schaumberg, L.L.P, of Washington, DC.

Before PLAGER, SCHALL, and GAJARSA, Circuit Judges.

## DECISION

GAJARSA, Circuit Judge.

This is an appeal from the judgment of the United States District Court for the Northern District of Texas, entered on a jury verdict, in a consolidated declaratory judgment and patent infringement action relating to U.S. Patent No. 5,453,863 (the "West patent"). Advanced Display Systems, Inc. ("ADS") filed a complaint in the Northern District of Texas seeking a declaratory judgment of invalidity of the West patent. Kent State University ("KSU"), an assignee of the West patent, and licensees Kent Research Corporation ("KRC") and Kent Display Systems, Inc. ("KDS") (collectively "Kent") then filed an infringement action, and the two cases were consolidated with Kent as the nominal defendant and ADS as the nominal plaintiff. The parties agreed to have a magistrate judge preside over the jury trial. Following the two-week trial, the jury found that the West patent was invalid for anticipation and obviousness and not infringed by ADS. Kent then moved for a new trial on all the issues in light of newly discovered evidence. Kent also moved for a new trial on anticipation, alleging an erroneous jury instruction. In addition, Kent filed a motion for sanctions against ADS's counsel for withholding evidence during discovery. The magistrate judge denied all of these motions. On appeal, we hold that prejudicial legal error tainted the jury instruction, we vacate the judgment, and remand for a new trial on anticipation. We also remand for a new trial on obviousness and infringement in light of the newly discovered evidence. Finally, we reverse the magistrate judge's ruling on the motion for sanctions.

## BACKGROUND

Since 1965, scientists at KSU's Liquid Crystal Institute ("LCI") have been researching the various properties and applications of liquid crystal materials. An important area of research focused on liquid crystal displays ("LCDs"). A typical LCD consists of a sandwich of liquid crystal material between two glass substrates. An electrical driver[1] connects to the sandwich in order to stimulate or address the liquid crystal material, thereby creating readable numerical or alphabetical characters. Manufacturers of electro-optic products—

---

1. An electrical driver is a device in which a power supply connects to electrodes, active matrices, and multiplexing circuits.

ucts, such as digital watches and notebook computers screens, use LCDs to display images and information.

Traditionally, LCDs were constructed by combining varying concentrations of liquid crystal materials and polymers. For example, one method for creating LCDs involved evaporating water from an aqueous emulsion of liquid crystal material in a solution of water-soluble polymer. Another method involved phase separation of liquid crystal from a homogenous solution with a synthetic resin to generate a liquid crystal phase blended with a polymer phase. Those methods, however, were expensive and entailed complex manufacturing processes. In addition, the presence of polymers created a haze effect that obstructed visibility of the displayed information when the LCDs were viewed from oblique angles.

In early 1992, Dr. John West ("West"), director of LCI, began experimenting with techniques for developing polymer-free LCDs. West eventually developed a new, polymer-free LCD using cholestric visible materials.[2] West determined that applying an electric field pulse of sufficient duration and voltage to cholestric visible material creates a contrast between the material's light reflecting and light scattering textures, thereby enabling a stable image display. West further found that a stable image could be sustained through a single electric field pulse rather than continuous application of an electric field. Thus, through the unique use of cholestric visible materials, West achieved the advantages of prior LCDs without the drawbacks attendant to the use of polymers.

On May 4, 1993, West and his colleague, Dr. Deng–Ke Yang, filed a patent application covering their polymer-free device and a method for stimulating it. On September 26, 1995, the application matured into

the West patent. West then assigned the patent to KSU, which through its licensing arm KRC, subsequently licensed the patent to KDS.

In February 1992, Dr. Bao Gang Wu ("Wu"), a former KSU student and colleague of West, formed ADS. In June 1993, Jiamini Gao ("Gao"), ADS's vice-president of research and development, secured a written formula for Kent's cholestric LCD. Even with knowledge of that formula, however, ADS failed to develop a functional LCD device because it could not construct an effective electrical driver.

In early 1994, Dr. Zvi Yaniv ("Yaniv"), then president of KDS and a former classmate of Wu, visited ADS and demonstrated a prototype of Kent's cholestric LCD and its electrical driver. Following the demonstration, Yaniv went to lunch with Wu, leaving the prototype at ADS's offices. Seizing the opportunity, Gao clandestinely removed the prototype from its box and brought it into an ADS laboratory. Gao then instructed a group of ADS engineers, including Victor Zhou ("Zhou"), to disassemble the prototype, photograph its various components, and re-assemble it in such a manner as to avoid any indication of tampering. Throughout this process, Gao urged his employees to work quickly to avoid detection because he knew the implication of the theft.

Prior to Yaniv's visit, ADS failed to develop an operational, polymer-free LCD through its independent efforts. Equipped with the photographs of Kent's prototype, however, ADS replicated Kent's cholestric LCD and electrical driver within a month. On April 11, 1994, ADS also filed a patent application for a polymer-free LCD based on the equivalent subject matter that had been photographed and copied during the surreptitious disassembly of Kent's prototype. The patent listed Wu, Gao, Zhou, and Yao–Dong Ma as in-

---

2. Cholestric visible material, also referred to as chiral nematic material, has a positive dielectric anisotropy and a pitch length effective to reflect light in the visible spectrum. Positive dielectric anisotropy refers to the material's ability to align parallel to an applied electric field.

ventors. While ADS's application was pending, the West patent issued, and the Patent and Trademark Office Examiner rejected ADS's claims directed exclusively to polymer-free LCDs as anticipated by the West patent. ADS consequently amended and limited its claims to cover the application of surface treatment in polymer-free LCDs. The ADS application eventually matured into U.S. Patent No. 5,625,477 on April 29, 1997.

In early 1996, Kent learned that ADS was promoting a polymer-free LCD and notified ADS that it intended to enforce the West patent. While Kent and ADS were discussing licensing arrangements, ADS filed a complaint in the Northern District of Texas seeking a declaratory judgment of invalidity of the West patent. After settlement negotiations failed, Kent sued ADS for infringement of the West patent, and the cases were consolidated in the Northern District of Texas.

Concurrent with discovery in the present case, ADS filed suit in Texas state court against USA Display, a company with several former ADS employees, alleging trade secret misappropriation. ADS's attorneys in the USA Display suit and in the present case were from the same law firm. During discovery in the USA Display suit, Zhou's deposition was taken. The pertinent parts of the deposition are set forth below.

Q: Can you describe for me or explain to me what Exhibit 3 is?

A: This is a picture taken by an employee in ADS. I cannot remember who took it, but I know Dr. Zvi Yaniv [and Kent] also develop a similar display, they call [theirs] bistable display, but in ADS they call multistable display. But ADS did not know how to design the driver for this device. So one day Dr. Zvi Yaniv visited ADS with a sample, and [Kent] have [a] completed driver.... And Dr. Zvi Yaniv gave to Jianmi Gao, who is the vice president of ADS and boss of R & D group, so he opened Dr. Zvi Yaniv['s] ... sample,

and took this picture, while at that time Dr. Zvi Yaniv was not there. So [Yaniv] did not know.

.    .    .    .    .

Q: What is this picture of?

A: This picture is the picture for the sample brought by Zvi Yaniv.

.    .    .    .    .

Q: And [Yaniv] gave [the sample to ADS]?

A: [H]e not gave a sample, he just waited at ADS with a sample and–

Q: [T]hen he left?

A: No, he did not [leave], he showed the sample. But during [t]his time period he left and [Gao] opened the box and took the picture.

.    .    .    .    .

Q: You were there?

A: Yeah, I was there.

Q: Did you open up the driver?

A: Yes. I was an employee there. I did whatever my boss told me to do.

.    .    .    .    .

Q: Where was Mr. Zvi Yaniv [at that time]?

A: Well, we are taking picture and I don't know who he was talking to, but he was somewhere within the building or maybe left for lunch.... I just know that [Gao] want us to take the picture, and we took it.

.    .    .    .    .

Q: Prior to the meeting in which the Kent State product was taken apart and photographed at ADS ... was ADS working on a similar type of display?

A: Yeah. They were trying to develop the similar thing.

Q: You said ... that ADS was trying to but had not succeeded in making a driver for [their LCD]; is that correct?

A: Yes that's correct.

.    .    .    .    .

Q: Would you please describe the difficulties?

A: Yeah, we did not know how to drive the new display since the driving is another difficult part for design[ing] the whole display. We did not know how to drive it, what kind of waveform.... We did not know that.

Q: [Was] exhibit 3 [helpful]?

A: Right. Exhibit 3. This is very big help. So since then we knew, we start to know how to design the driver.

.    .    .    .    .

Q: [B]efore the photograph was made. How was [Gao] involved in trying to make the driver?

A: We tried [for] a long time—we tried to understand how to drive it, but were not successful.

Q: Did [Gao know?]

A: He had some idea but all not successful.

Q: None of his ideas were?

A: No. We didn't even-

.    .    .    .    .

Q: [During] the time period before the Kent State product was taken apart and photographed in the ADS lab.... [Was] ADS ... trying to make a driver?

A: Right.

Q: And failed. Could not do it.

A: No. They did not have an idea at that time.

.    .    .    .    .

Q: Why did ADS need a driver for [its LCD]?

A: Without the driving circuit, no one [is] interested in that [LCD]. That is just a piece of glass. You have to make the life.

.    .    .    .    .

Q: Do you know when ... Mr. Gao brought you the formula for the Kent State cholestric material?

.    .    .    .    .

A: Before June.

Q: Before June of what?

A: June '93.

Q: Before Mr. Gao gave you the formulation, had ADS succeeded in making any [LCD] cholestric materials?

A: I did not see it.

Q: After he gave you what he told you to be the Kent State formula, were you successful in making cholestric [LCD] material?

A: Yeah.

Q: You were?

A: After he gave me [the Kent State formulation].

Q: How long did it take you after he gave you the formulation?

A: Few days.

.    .    .    .    .

Q: All right. Now after you used the Kent State formulation to make the [LCD], your next problem was the driver?

A: Yeah.

Q: And on the day that Zvi Yaniv visited ADS and brought the [Kent prototype] module to show everybody, that the photographs were made, did Zvi Yaniv know the module was being photographed?

A: [Gao] ... told us to be quick. Don't let Dr. Zvi Yaniv know....

.    .    .    .    .

Q: So after the photographs were made, what happened to the [Kent prototype]? Was it reassembled?

A: Reassembled and the[n] gave [it back to Yaniv].

Q: How long did it take to photograph it?

A: Pretty quick.

Q: [Gao] told you to be quick, didn't he?

A: Yeah, pretty quick.

.    .    .    .    .

Q: After the Kent State [prototype] was copied, were you successful in making a driver?

A: Yes. After about a month or so.

Q: How did your driver compare to the Kent State driver?

A: We changed the microprocessor but we used the driver. The driver is the key part, the most important to this.

Q: The cholestric material that was developed at ADS was based upon the formulas from Kent State?

A: Yes.

Q: And the driver on the [LCD] at ADS was based upon the driver from Kent State?

A: Yeah, at that time, yes.

Q: You didn't know whether Kent State or ADS owned the technology, did you?

A: I know—technically I know the basic[s] are the same.

Q: The basic[s] of the Kent State—

A: The chemistry mixture and the way they make the cell are the same.

Q: As Kent State and ADS?

A: Right....

Q: Why didn't [ADS] just buy the functioning [driver] ... ?

A: [I]t is not market available, I think. We cannot buy it.

Q: Is it true that there are hundreds of shelf drivers?

A: Thousands and thousands.

Q: And so theoretically you could begin today to test and test drivers for years and not, other than by accident, hit the right driver?

A: By luck you may get it in a second. If not luck, it takes 10 years, it takes your life.

Q: So in order to find one that [properly charged the LCD], you either do random experimentation to find a shelf driver or invent or create a new driver?'

A: Yeah.

Q: Or use somebody else's driver?

A: Right.

Q: [N]one of [the drivers] was built before ADS got this photograph?

A: Right.

Q: So the entire system that makes this was still to be done?

A: Right.

Q: And was anybody working on designing this system?

A: [W]e did not know how to design.... We don't know.

Q: [Dr. Wu] told you to change things around so that he could get out—away from an earlier patent?

A: He tried to find us a new way to build another kind of [polymer-free LCD] so we can avoid a conflict with Kent State, yes.

Q: Why didn't you find a new way?

A: It is very hard.... We did not have the time, we did not have the money to test everything.

During this testimony, ADS's attorney attempted to terminate the deposition and telephoned the presiding judge to request a protective order. The judge denied ADS's request but suggested that both parties keep the deposition confidential until ADS filed a formal motion for a protective order. ADS, however, never filed the motion and eventually abandoned the suit. ADS's attorney also instructed the court reporter not to prepare a transcript of the deposition.

During discovery in the present case, ADS failed to disclose to Kent the events that took place during Yaniv's lunch with Wu in spite of various demands made upon

ADS. In particular, Kent served upon ADS a document request for "[a]ll documents that refer or relate to any evaluation, analysis, examination, testing, performance, or investigation of any light-modulating reflective device comprising [cholestric material] or any compound thereof made by KDS, the [LCI], or any third party." ADS's attorneys, however, failed to notify Kent about Zhou's identity or the deposition in the USA Display suit. ADS's attorneys also failed to produce the photograph of Kent's prototype, instead characterizing it as "Attorney Work Product" in the privilege log.[3]

At the end of discovery, all pre-trial issues regarding claim construction, validity, and infringement were submitted to a Special Master, who construed the claims and recommended a denial of ADS's motion for summary judgment on the issue of anticipation. The magistrate judge then adopted the Special Master's report, and this case proceeded to a jury trial.

At trial, both parties presented evidence and expert testimony concerning anticipation, obviousness, and infringement. On the issue of anticipation, in particular, ADS argued that the West patent was anticipated by U.S. Patent No. 4,097,127 (the "Haas patent") and the documents incorporated by reference therein. The documents incorporated into the Haas patent disclosed hundreds of different liquid crystal materials that could reflect visible and infrared light. From that body of materials, ADS contended, with perfect hindsight, that the combination of the Haas patent and three particular liquid crystal materials taught every element of the West patent.

Into the first week of trial, Kent was advised by Mr. Kan Xu, a former ADS employee and president of USA Display, that Zhou possessed information relevant to the case. Then, more than one week into trial and without an opportunity to probe Zhou's knowledge, Kent called Zhou to testify about how ADS disassembled Kent's prototype and photographed it. The photograph was also finally provided to Kent and admitted into evidence. At this stage, however, Kent still did not possess a copy of Zhou's deposition transcript from the USA Display suit.

At the close of evidence, Kent's attorney did not make a motion for Judgment as a Matter of Law ("JMOL") on either the validity or infringement issues. On the issue of anticipation, the magistrate judge instructed the jury that their role was to determine whether and to what extent material from other documents was incorporated by reference into the Haas patent. Kent's attorney objected to this instruction, but the magistrate judge overruled the objection and included the instruction in his final charge to the jury. The magistrate judge also provided the following definition of incorporation by reference:

> [T]he purpose of incorporation by reference is to make one document become part of another document by referring to the form in the latter in such a manner that it is apparent that the cited document is part of the referencing document as if it were fully set out therein.

After initial deliberations, the jury was unable to resolve the issues of anticipation and obviousness. The magistrate judge, however, instructed the jurors to continue deliberating until they reached a verdict. Two hours later, the jury determined that the West patent was invalid for anticipation and obviousness and not infringed.

Following the jury verdict, Kent's attorney again failed to make a motion for JMOL. Rather, having finally received Zhou's deposition transcript, Kent filed a motion for a new trial based on (1) newly discovered evidence in view of the deposition, and (2) ADS's withholding of relevant evidence during discovery. KDS also filed a motion seeking the imposition of sanc-

---

**3.** At oral argument, ADS's counsel claimed that the photograph in its possession was attorney work product because it was a copy made by an attorney of the original photograph.

tions against ADS and its attorneys for improper conduct during discovery. Regarding Kent's motion for a new trial, the magistrate judge found that Zhou's deposition was merely cumulative of his testimony at trial. The magistrate judge also determined that Kent was not prejudiced by the late disclosure of the photograph and the evidence relating to ADS's disassembly of Kent's prototype, because Kent was able to present that evidence to the jury. As for sanctions, the magistrate judge denied KDS's motion but remarked that he was "deeply concerned" with the conduct of ADS's attorneys and indicated that he would consider further disciplinary action.

## ANTICIPATION

■ Anticipation is a question of fact, *see In re Graves*, 69 F.3d 1147, 1151, 36 USPQ2d 1697, 1700 (Fed.Cir.1995), that this court reviews for substantial evidence on appeal from a jury trial, *see Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1332, 47 USPQ2d 1225, 1233 (Fed.Cir. 1998). However, a party's failure to make a motion for JMOL, *see* Fed.R.Civ.P. 50(b), at any phase of the litigation precludes an appellate court from reviewing the sufficiency of the evidence underlying the jury verdict. *See Biodex Corp. v. Loredan Biomedical Inc.*, 946 F.2d 850, 862, 20 USPQ2d 1252, 1261 (Fed.Cir.1991) (holding that failure to make a post-verdict JMOL forecloses appellate review of the jury's factfinding); *Jurgens v. McKasy*, 927 F.2d 1552, 1557, 18 USPQ2d 1031, 1035 (Fed.Cir.1991) (requiring a party to make a motion for directed verdict in order to challenge the sufficiency of the evidence on appeal); *see also* 9A Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 2536 (2d ed.1994) (explaining that the rationale for the rule is that a party's failure to make a motion

for JMOL works as a concession that sufficient evidence exists for a jury to reach a verdict). In the present case, because Kent did not make a motion for JMOL at the close of evidence or following the jury verdict, we will not disturb the jury's factual determinations.

■ Notwithstanding the absence of a motion for JMOL, a party may still challenge a jury verdict by establishing that the judge committed legal error or abused his discretion. *See Biodex*, 946 F.2d at 854, 20 USPQ2d at 1255 (stating that jury verdict may be altered if the instructions "were incorrect or incomplete as given"); *Jurgens*, 927 F.2d at 1557–58, 18 USPQ2d at 1036 (providing that, despite the absence of a JMOL motion, party could challenge judgment based on jury instructions). On appeal, Kent contends that the magistrate judge committed legal error by instructing the jury to determine what material was incorporated by reference into the Haas patent for purposes of anticipation.[4] A party seeking to alter a judgment based on erroneous jury instructions must establish that (1) it made a proper and timely objection to the jury instructions, (2) those instructions were legally erroneous, *see Biodex*, 946 F.2d at 853–54, 20 USPQ2d at 1254–55, (3) the errors had prejudicial effect, *see Jamesbury Corp. v. Litton Indus. Prod., Inc.*, 756 F.2d 1556, 1558, 225 USPQ 253, 255 (Fed.Cir.1985), and (4) it requested alternative instructions that would have remedied the error. *See Delta–X Corp. v. Baker Hughes Prod. Tools, Inc.*, 984 F.2d 410, 415, 25 USPQ2d 1447, 1450–51 (Fed.Cir.1993).

■ Pursuant to Rule 51 of the Federal Rules of Civil Procedure, a party must object to jury instructions "before the jury retires to consider its verdict, stating distinctly the matter objected to and the

---

4. Kent also filed a motion for a new trial on anticipation in light of the newly discovered evidence. Anticipation presents a question of what a prior art publication teaches, and because the Haas patent was available to Kent during trial, we do not understand Kent's motion for a new trial based on newly discovered evidence to pertain to the anticipation issue.

grounds for objection." Fed.R.Civ.P. 51. Because objection to a jury instruction involves a procedural matter that is not intimately related to this court's exclusive jurisdiction, we look to the regional circuit law to ascertain the requirements necessary to comply with the rule. *See Lummus Indus., Inc. v. D.M. & E., Corp.*, 862 F.2d 267, 270, 8 USPQ2d 1983, 1985 (Fed. Cir.1988) (applying Fourth Circuit law to determine whether a party timely objected to a jury instruction). According to Fifth Circuit law, a party satisfies Rule 51 by objecting to an instruction prior to the jury's deliberation and stating the reason for its objection. *See A.B. Baumstimler v. Rankin*, 677 F.2d 1061, 1069, 215 USPQ 575, 581–82 (5th Cir.1982). Here, Kent objected before the magistrate judge charged the jury and explained that the instruction was erroneous because the jury should not decide what material was incorporated by reference. Kent's objection therefore complied with Fifth Circuit law.

■ Whether a jury instruction is legally erroneous is a question of law. *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1570, 24 USPQ2d 1401, 1411 (Fed.Cir.1992). When reviewing an instruction for legal error, this court reads the instructions as a whole and considers them in light of the entire charge to the jury. *See United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1564, 41 USPQ2d 1225, 1232 (Fed. Cir.1997) ("Jury instructions are reviewed for correctness, with due attention to their clarity, objectivity, and adequacy, taken as a whole."); *Biodex*, 946 F.2d at 854, 20 USPQ2d at 1255 (noting that this court reviews jury instructions in their entirety). Here, the relevant inquiry is whether the magistrate judge committed legal error in his jury instruction on anticipation.

■■ Section 102(b) provides that "a person shall be entitled to a patent unless the invention was patented or described in a printed publication ... more than one year prior to the date of the application." 35 U.S.C. § 102(b) (1994). Accordingly, invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention, either expressly or inherently, such that a person of ordinary skill in the art could practice the invention without undue experimentation. *See Atlas Powder Co. v. Ireco Inc.*, 190 F.3d 1342, 1347, 51 USPQ2d 1943, 1947 (Fed.Cir. 1999); *In re Paulsen*, 30 F.3d 1475, 1479, 31 USPQ2d 1671, 1673 (Fed.Cir.1994). Material not explicitly contained in the single, prior art document may still be considered for purposes of anticipation if that material is incorporated by reference into the document. *See Ultradent Prods., Inc. v. Life–Like Cosmetics, Inc.*, 127 F.3d 1065, 1069, 44 USPQ2d 1336, 1339–40 (Fed.Cir.1997) (holding that material incorporated by reference into a document may be considered in an anticipation determination). Incorporation by reference provides a method for integrating material from various documents into a host document— a patent or printed publication in an anticipation determination—by citing such material in a manner that makes clear that the material is effectively part of the host document as if it were explicitly contained therein. *See General Elec. Co. v. Brenner*, 407 F.2d 1258, 1261–62, 159 USPQ 335, 337 (D.C.Cir.1968); *In re Lund*, 54 C.C.P.A. 1361, 376 F.2d 982, 989, 153 USPQ 625, 631 (CCPA 1967). To incorporate material by reference, the host document must identify with detailed particularity what specific material it incorporates and clearly indicate where that material is found in the various documents. *See In re Seversky*, 474 F.2d 671, 674, 177 USPQ 144, 146 (CCPA 1973) (providing that incorporation by reference requires a statement "clearly identifying the subject matter which is incorporated and where it is to be found"); *In re Saunders*, 58 C.C.P.A. 1316, 444 F.2d 599, 602–03, 170 USPQ 213, 216–17 (CCPA 1971) (reasoning that a rejection for anticipation is appropriate only if one reference "expressly incorporates a particular part" of another reference); *National Latex*

*Prods. Co. v. Sun Rubber Co.,* 274 F.2d 224, 230, 123 USPQ 279, 283 (6th Cir.1959) (requiring a specific reference to material in an earlier application in order have that material considered part of a later application); *cf. Lund,* 376 F.2d at 989, 153 USPQ at 631 (holding that a one sentence reference to an abandoned application is not sufficient to incorporate material from the abandoned application into a new application).

■ Whether and to what extent material has been incorporated by reference into a host document is a question of law. *See Quaker City Gear Works, Inc. v. Skil Corp.,* 747 F.2d 1446, 1453–54, 223 USPQ 1161, 1166 (Fed.Cir.1984) (reasoning that whether a document is incorporated by reference into a patent presents a question of law when determining enablement). As the court observed in *General Electric,* the doctrine of incorporation by reference has its roots in the law of wills and contracts. 407 F.2d at 1260, 159 USPQ at 337. In those areas of jurisprudence, whether material is incorporated by reference presents a question of law. *See* 11 Richard A. Lord, *Williston on Contracts* § 30:25 (4th ed.1999) (observing that terms of a contract may be expressed in separate documents and the determination of which terms are incorporated into the contract is a question of law); George Taylor Bogert, *The Law of Trusts and Trustees,* § 105 (2d ed. rev.1984) (describing the use of incorporation by reference to supply additional terms to a will and providing cases holding that whether terms are incorporated into a will is a question of law); *see also Topro Servs., Inc. v. McCarthy W. Constr., Inc.,* 827 F.Supp. 666, 667 (D.Colo.1993) ("Whether the Prime Contract, or any part of it, was incorporated by reference into the Subcontract is a question of law."); *Siler v. Dorsett,* 108 N.C. 300, 302, 12 S.E. 986, 987 (N.C.1891) (holding that court decides whether a will incorporated material from other documents). Logic therefore requires that incorporation by reference in

the field of patent law is also a question of law. Further, the standard of one reasonably skilled in the art should be used to determine whether the host document describes the material to be incorporated by reference with sufficient particularity.

Moreover, no necessary contradiction exists given that incorporation by reference is a question of law while anticipation is a question of fact. Anticipation, put simply, requires that every element of the claimed invention was previously "*described* in a *single* reference." *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991) (emphasis added). Thus, if incorporation by reference comes into play in an anticipation determination, the court's role is to determine what material in addition to the host document constitutes the single reference. The factfinder's role, in turn, is to determine whether that single reference describes the claimed invention.

■ Turning now to the present case, ADS argued at trial that the West patent was anticipated by the Haas patent and the material incorporated therein from other documents. The magistrate judge charged the jury with the task of determining what material was incorporated by reference. As explained above, it was the duty of the magistrate judge to determine, as a matter of law, whether and what material was incorporated by reference into the Haas patent. Thus, we conclude that instructing the jury to make that determination constituted legal error.

We next consider whether that error was prejudicial. Prejudicial legal error exists when it "appears to the court [that the error is] inconsistent with substantial justice." Fed.R.Civ.P. 61. In the present case, determining what material was incorporated by reference into the Haas patent was a critical question of law for the magistrate judge to resolve before submitting the factual issue of anticipation to the jury. Indeed, during trial, ADS never contended that the material explicitly set forth in the Haas patent alone would anticipate the

West patent. Rather, ADS's anticipation argument hinged on the combination of the Haas patent and the material potentially incorporated therein. The magistrate judge, however, failed to address the legal question; instead, he left that determination for the jury. This misallocation of responsibility goes to the core of an anticipation determination when, if incorporation by reference is at issue, the court must determine what material constitutes the single, prior art document. Consequently, because the instruction vitiated Kent's right to have a pivotal legal question resolved by the court, we hold that the legal error was prejudicial.

■■■■ We further hold that Kent's objection would have cured the defect. In the present case, the proper jury instruction on incorporation by reference would have been no instruction at all. Thus, Kent's request that the question of incorporation by reference not be submitted to the jury would have ameliorated the error.

Accordingly, given that Kent preserved its right to appeal the jury instruction and prejudicial legal error infected that instruction, we remand for a new trial on anticipation.

## OBVIOUSNESS

■■■■ Because Kent failed to make a motion for JMOL at any time during trial, we cannot weigh the sufficiency of the evidence underlying the jury's factual findings on obviousness. *See Biodex,* 946 F.2d at 862, 20 USPQ2d at 1261. Kent, however, preserved its right to seek relief from the verdict by making a motion for a new trial, which the magistrate judge denied. *See New Idea Farm Equip. Corp. v. Sperry Corp.,* 916 F.2d 1561, 1565–66, 16 USPQ2d 1424, 1428 (Fed.Cir.1990) (providing that, as an alternative to a post-verdict motion, court may grant motion for a new trial if prejudicial error occurred). This court reviews a denial of a motion for a new trial under the abuse of discretion standard. *See Motorola, Inc. v. Interdigi-*

*tal Tech. Corp.,* 121 F.3d 1461, 1468, 43 USPQ2d 1481, 1486 (Fed.Cir.1997). To that end, we must determine whether, in the conduct of the trial, an error occurred that was so egregious as to render the trial unfair. *See DMI, Inc. v. Deere & Co.,* 802 F.2d 421, 427, 231 USPQ 276, 280 (Fed. Cir.1986).

■■■■ Rule 59(a) of the Federal Rules of Civil Procedure provides that a "new trial may be granted to . . . any of the parties . . . in an action in which there has been a trial by a jury, for any of the reasons for which new trials have heretofore been granted in actions at law in courts of the United States." Fed. R.Civ.P. 59(a); *see Blue Diamond Co. v. Charles M. Allen & Son, Inc.,* 56 F.2d 1, 3 (5th Cir.1932) (recognizing that newly discovered evidence can give rise to a right to a new trial). Kent contends that it is entitled to a new trial due to newly discovered evidence—namely, the Zhou deposition. Determining whether the newly discovered evidence warrants a new trial entails the following three-prong analysis: (1) the probability that the evidence would have changed the outcome of the trial; (2) whether the evidence could have been discovered earlier through the moving party's due diligence; and (3) whether the evidence is merely cumulative or impeaching. *See Farm Credit Bank v. Guidry,* 110 F.3d 1147, 1155 (5th Cir.1997); *Diaz v. Methodist Hosp.,* 46 F.3d 492, 495 (5th Cir.1995).

■■■■ This court measures whether the newly discovered evidence is potentially outcome determinative by reference to our obviousness jurisprudence. A claimed invention is invalid for obviousness if the differences between it and the prior art "are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art." 35 U.S.C. § 103(a) (1994); *see Graham v. John Deere Co.,* 383 U.S. 1, 13–14, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966). Obviousness is ultimately a question of law that rests on

underlying factual inquiries including: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed invention and the prior art; and (4) objective considerations of nonobviousness. *See Graham*, 383 U.S. at 17–18, 86 S.Ct. 684; *Robotic Vision Sys., Inc. v. View Eng'g, Inc.*, 189 F.3d 1370, 1376, 51 USPQ2d 1948, 1953 (Fed.Cir.1999). Objective considerations such as failure by others to solve the problem and copying, *see Graham*, 383 U.S. at 17–18, 86 S.Ct. 684, "may often be the most probative and cogent evidence" of nonobviousness. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538, 218 USPQ 871, 879 (Fed.Cir.1983).

In the present case, Zhou's deposition furnishes persuasive evidence that the West patent is nonobvious by describing ADS's repeated failures to design the claimed invention. In his deposition, Zhou testified that ADS was entirely unsuccessful in developing the cholestric visible material through independent research. Zhou also explained that ADS "tried for a long time" to build an electrical driver, but its efforts "were all not successful." Zhou further detailed how ADS's attempts to develop a polymer-free LCD met with failure and that ADS "did not know how to design" the device until it copied the claimed invention. In addition, Zhou testified that, even after gaining access to the claimed invention, ADS was unable to design around the West patent because such a task was time consuming and "very hard."

Our case law supports Kent's view that such evidence of failed attempts by others could be determinative on the issue of obviousness. For example, in *Alco Standard Corp. v. Tennessee Valley Authority*, this court held that when evidence in the record fully supports a finding that others in the industry failed to solve the problem, then objective considerations "may ... establish that an invention appearing to have been obvious in light of the prior art was not." 808 F.2d 1490, 1500–01, 1 USPQ2d 1337, 1344–45 (Fed.Cir.1986). Similarly, in *Intel Corp. v. United States International Trade Commission*, we reasoned that an accused infringer's inability to develop a product made possible by the claimed invention indicated nonobviousness. 946 F.2d 821, 835, 20 USPQ2d 1161, 1173 (Fed. Cir.1991); *see also Minnesota Mining & Mfg. Co. v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1574, 24 USPQ2d 1321, 1333–34 (Fed.Cir.1992) (reasoning that competitors' failure to develop the patented invention suggested nonobviousness); *Panduit Corp. v. Dennison Mfg. Co.*, 774 F.2d 1082, 1099, 227 USPQ 337, 349 (Fed.Cir.1985) (reasoning that failure by others, including the accused infringer, to develop the claimed invention constitutes "virtually irrefutable" evidence of nonobviousness), *vacated Dennison Mfg. Co. v. Panduit Corp.*, 475 U.S. 809, 106 S.Ct. 1578, 89 L.Ed.2d 817 (1986) (vacating for failure to give proper deference to district court's fact finding rather than legal error).

Zhou's deposition also provides compelling evidence of nonobviousness by illustrating ADS's wholesale copying of the claimed invention. *See Specialty Composites v. Cabot Corp.*, 845 F.2d 981, 991, 6 USPQ2d 1601, 1608 (Fed.Cir.1988) (reasoning that an accused infringer's close copying of the "claimed invention, rather than one in the public domain, is indicative of nonobviousness"). Indeed, Zhou's deposition reveals that ADS's device was virtually an identical replica of the claimed invention. Zhou testified that the Kent and ADS "chemistry mixture[s] and the way[s] they make the cell are the same." Underlying that comparison was Zhou's testimony that ADS developed its cholestric visible material by copying Kent's formula. Zhou also explained that ADS built its electrical driver by disassembling Kent's prototype, photographing its features, and then using the photograph essentially as an instruction manual. The import of such copying evidence merits even greater weight in view of ADS's fail-

ure to develop independently the claimed invention. *See Dow Chem. Co. v. American Cyanamid Co.*, 816 F.2d 617, 622, 2 USPQ2d 1350, 1355 (Fed.Cir.1987) (reasoning that an infringer's failed attempts to develop the claimed invention followed by subsequent copying of the invention supports a holding of nonobviousness); *Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567, 224 USPQ 195, 199 (Fed.Cir. 1984) ("The copying of an invention may constitute evidence that the invention is not an obvious one.... This would be particularly true where the copyist had itself attempted for a substantial length of time to design a similar device, and had failed.").

Furthermore, with respect to both objective considerations, Zhou's deposition testimony constitutes highly probative evidence of nonobviousness given that after initial deliberations the jury was in equipoise on the issue of obviousness, and this newly discovered evidence could have been the tipping factor for finding the West patent to be not invalid. Thus, we find that the constellation of facts contained in the Zhou deposition presents evidence that is potentially outcome determinative on the issue of obviousness.

We also hold that Kent exercised due diligence throughout the discovery process, but it was powerless to unearth the Zhou deposition because ADS deliberately and intentionally withheld the deposition and the photograph of Kent's prototype. In its first document request, Kent required: "All documents that refer or relate to any evaluation, analysis, examination, testing, performance, or investigation of any light-modulating reflective device comprising [cholestric material] or any compound thereof made by KDS, the [LCI], or any third party." In its interrogatories, Kent asked ADS to

[I]dentify each communication that ADS, or its present or former ... employees ... has participated in or has knowledge of that refers or relates to [Kent] or products being developed, under re-

search, under investigation, made, sold, or offered for sale by [Kent] or to any claims asserted by any party in this lawsuit or to any allegations that ADS has made against or about [Kent]. With reference to each communication, provide ... the identity of all documents referring or relating to the communication....

Any fair reading of the document request and interrogatory, coupled with ADS's duty to supplement its disclosures and responses under Rule 26(e) of the Federal Rules of Civil Procedure, required ADS to disclose the existence of the Zhou deposition and to produce the photograph of Kent's prototype.

ADS, however, effectively concealed both pieces of evidence. With regard to the deposition, ADS's counsel instructed the court reporter not to prepare a transcript and then quickly abandoned the state court suit, thereby suppressing the existence of Zhou's deposition testimony. As for the photograph, which was initially produced at the deposition, ADS characterized it as "attorney work product." As a result, by preventing Kent from examining the photograph and inquiring about how ADS came to possess it, ADS completely sealed off Kent from discovering the existence of the Zhou deposition, much less its substance.

In fact, the sole reason that Kent was able to discover that Zhou possessed crucial information was through its continued diligence. Midway through trial, Kent served a trial subpoena on Mr. Kan Xu, a former ADS employee, who then advised Kent that Zhou would be a useful witness to their case. Thus, half-way through trial and by virtue of its own effort, Kent became aware of information that ADS's counsel was obligated to disclose months earlier during the normal course of discovery. Kent, however, still could not ascertain the full scope of Zhou's knowledge because it did not receive the deposition transcript until after the jury retired to deliberate.

We further hold that Zhou's deposition testimony is not merely cumulative or impeaching. Rather, Zhou's deposition contained a significant amount of material evidence that ADS prevented Kent from presenting at trial. For example, the jury did not hear Zhou's deposition testimony about how ADS obtained Kent's cholestric formula, used that formula to duplicate Kent's cholestric material, and then used that material in its own device; nor did the jury hear Zhou's admission that ADS's electrical driver was essentially the same as Kent's. The jury also did not hear Zhou's statements concerning the extent of ADS's failure to develop its own device or the detailed copying of Kent's prototype. Furthermore, the jury did not hear about ADS's failure to design around the claimed invention even after it disassembled and studied Kent's prototype.

Moreover, to the extent that some overlap exists between the Zhou deposition testimony and his trial testimony, we do not find it sufficient to preclude a new trial. To find otherwise would be to prejudice the party who acts diligently and complies with the Federal Rules of Civil Procedure and to benefit the party who contravenes those rules and uses dilatory discovery tactics. Indeed, one can readily imagine a situation in which counsel conceals material evidence throughout discovery and then reveals that evidence late into the trial, thereby depriving the other party of a fair trial in the first instance as well as foreclosing the opportunity for a new trial. Such a result would be manifestly unjust.

Thus, in light of the newly discovered evidence, we remand for a new trial on the issue of obviousness.

### INFRINGEMENT

■ As with obviousness, Kent's only viable argument to alter the non-infringement verdict is through a motion for a new trial. Because the analysis for the last two prongs of the test for a motion for a new trial is the same for obviousness and infringement, we limit our discussion to the first prong—whether the newly discovered evidence is potentially outcome determinative on the issue of infringement.

■ To establish infringement a party must show that the accused device contains, either literally or by equivalents, every limitation of the claimed invention. See Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc., 98 F.3d 1563, 1574, 40 USPQ2d 1481, 1489 (Fed.Cir.1996); Pennwalt Corp. v. Durand–Wayland, Inc., 833 F.2d 931, 934–35, 4 USPQ2d 1737, 1739–40 (Fed.Cir.1987) (en banc). During the deposition, Zhou testified that the design of ADS's device was directly "based upon" Kent's cholestric material formula and its electrical driver circuitry. Zhou also explained that the Kent's and ADS's "chemistry mixture[s] and the way they make the cell are the same." Zhou further testified that ADS failed to design a device that was different from the claimed invention.

Although not itself evidence of infringement, Zhou's deposition is compelling evidence relating to infringement. Zhou was one of the engineers who worked on ADS's device and possessed an intimate understanding of the similarities between ADS's device and the claimed invention. Zhou's deposition directly addresses how ADS's electrical driver circuitry was designed and implemented. That circuitry provides a waveform to change portions of the liquid crystal. The way in which ADS's device causes the liquid crystal to switch is material to the question of literal infringement because the West patent covers a particular method for stimulating the liquid crystal. In addition, the evidence of copying present in Zhou's deposition supports a claim of infringement under the doctrine of equivalents. See Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 612, 70 S.Ct. 854, 94 L.Ed. 1097 (1950); Roton Barrier, Inc. v. Stanley Works, 79 F.3d 1112, 1126, 37 USPQ2d 1816, 1827 (Fed. Cir.1996).

Furthermore, the impact of Zhou's deposition on the issue of infringement is not limited solely to the content of the deposition; rather, this evidence has ramifications that would have greatly changed the complexion of Kent's trial strategy. If Kent possessed this evidence before trial, it could have chosen to depose more witnesses—most notably Zhou, pursued different avenues of discovery, sought additional corroborating evidence, implemented different tactics during cross-examination, and so forth. In short, armed with the Zhou deposition at an early stage in discovery, Kent could have developed a different theory of the case and presented a more persuasive story at trial.

Accordingly, based on the newly discovered evidence, we remand for a new trial on infringement.

## SANCTIONS

■ Following the jury verdict, Kent made a motion for sanctions against ADS's counsel, seeking sanctions in the form of new trial given ADS's suppression of the Zhou deposition and the photograph of Kent's prototype. The magistrate judge denied the motion but indicated that he was "deeply concerned" by the conduct of ADS's counsel. The magistrate judge also indicated that he would seriously consider taking disciplinary action under the local rules and imposing appropriate sanctions other than granting a new trial.

■ When reviewing a district court's decision on the propriety of imposing sanctions for misconduct during discovery, we apply the regional circuit's law. *See Seal–Flex, Inc. v. Athletic Track & Court Constr.,* 172 F.3d 836, 845, 50 USPQ2d 1225, 1231 (Fed.Cir.1999). The Fifth Circuit reviews a denial of sanctions for an abuse of discretion. *See Tacon Mechanical Contractors, Inc. v. Aetna Cas. & Sur. Co.,* 65 F.3d 486, 489 (5th Cir.1995). Although a district court possesses inherent power to sanction an attorney's bad faith conduct during litigation,

*see Chambers v. NASCO, Inc.,* 501 U.S. 32, 43–46, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), the threshold for the imposition of such sanctions is high, *see Chaves v. M/V Medina Star,* 47 F.3d 153, 156 (5th Cir. 1995). Thus, the district court must make a specific finding of bad faith conduct in order to impose sanctions. *See id.*

From the record below, it appears to this court that ADS's development of its LCD technology consisted of deceitful and conniving machinations that amounted to nothing short of corporate espionage of a competitor's valuable technology. Regretfully, the conduct of ADS's counsel in defending such actions was equally egregious. Indeed, to say that counsel's conduct during discovery raises the collective eyebrow of this court would be to understate the severity of their transgressions.

Counsel's tactics during discovery evinced a brazen disregard for the legal process. Throughout discovery, counsel's strategy consisted of efforts to obfuscate, cover-up, and subvert evidence that was properly discoverable and responsive to Kent's requests. For example, when confronted with the bleak realization that Zhou's deposition would reveal damaging information, ADS's counsel attempted to terminate the deposition. Counsel next tried to eliminate any trace of the deposition by instructing the court reporter not to make a transcript. Counsel then failed to disclose the deposition's existence during the discovery stage of the action. Counsel further failed to list Zhou as a person having knowledge of the development of ADS's LCD technology, even though he was an engineer at ADS working on the project during those years.

Moreover, in what may be its most egregious discovery ploy, counsel characterized the photograph of Kent's prototype as "Attorney–Work product," even though the photograph was taken by an ADS employee years before the present litigation ensued. When asked about the justification for listing the photograph on the privilege

log, ADS's counsel responded that the original photograph was photocopied by an attorney. This court, however, is unable to find any legal principle that even remotely supports the notion that an otherwise discoverable document alchemically metamorphisizes into privileged work product simply because an attorney photocopies it.

Thus, we conclude that the suppression of the Zhou deposition and the concealment of the photograph through a spurious privilege claim, coupled with the central role that such evidence would have played at this trial, amounts to bad faith conduct on the part of ADS's counsel. In a case such as this, in which counsel deliberately and repeatedly flouts discovery requests and disregards the Federal Rules of Civil Procedure, the sanction of a new trial fits the transgression. Indeed, the acts of ADS's counsel strike at the heart of the discovery process, and they deprived Kent of its full measure of a right to a fair trial based upon all the relevant evidence. Accordingly, we reverse the magistrate judge's denial of a motion for sanctions by granting a new trial. Furthermore, we strongly encourage the magistrate judge to follow through on his desire to review very carefully the conduct of ADS's counsel and to consider, within his discretion, imposing disciplinary actions and additional sanctions beyond the granting of a new trial.

## CONCLUSION

Based upon the discussion above, we vacate the judgment and remand for a new trial on the issue of anticipation because the magistrate judge's jury instruction contained prejudicial legal error. We also remand for a new trial on the issues of obviousness and infringement because of the newly discovered evidence. In addition, we also reverse the magistrate judge's ruling on sanctions by the grant of a new trial.

*REVERSED–IN PART, VACATED–IN–PART, AND REMANDED.*

COSTS

Costs to Kent.